**ASSOCIATED TRUCK LINES, INC.,** Holland Motor Express, Inc., North Express, Inc., Overland Express, Inc., Renner's Express, Inc., Turner Trucking Company, Inc., Appellants (Protestants Below),

v.

**PUBLIC SERVICE COMMISSION OF INDIANA, State of Indiana and Central Transport, Inc., Appellees.**

No. 2–485–A115.[1]

Court of Appeals of Indiana, Fourth District.

May 15, 1986.

1. Transferred from the Second District to the Fourth District by order of the Chief Judge.

Donald W. Smith, Smith & Murdock, Indianapolis, for appellants (protestants below).

Andrew K. Light, Lynne D. Lidke, Scopelitis & Garvin, Indianapolis, for appellees.

MILLER, Judge.

The Public Service Commission of Indiana (PSC) granted an application to Central Transport, Inc. (Central) for intrastate motor common carrier service. This appeal was brought by a number of competing motor carriers who opposed the application. They assert the decision to grant the application was arbitrary and capricious due to (1) procedural irregularities during the application proceedings; (2) the use of nonstatutory criteria to determine whether public convenience and necessity required granting the application; and (3) the use of different standards from that of a similar application which was denied.

We affirm.

## FACTS

Central operates as an interstate motor carrier pursuant to Interstate Commerce Commission's authority and is authorized to transport general commodities among all points in the forty-eight continental United States. In addition, Central possesses varying degrees of intrastate authority issued by state agencies which allow it to serve the states of Arkansas, Illinois, Kentucky, Michigan, New York, and Ohio. Moreover, Central is able to provide service in the province of Ontario, Canada through a sister corporation.

Since 1969, Central has been serving parts of northern Indiana under various types of intrastate authority granted by the PSC. Its existing Indiana authority permits the transportation of general commodities over a network of regular routes between the Calumet area in northwestern Indiana, through the South Bend and Plymouth areas in north central Indiana, to the Fort Wayne area in northeastern Indiana. Central also has authority to transport, over irregular routes, general commodities between points within a fifty mile radius of Kokomo, Indiana. In 1982, Central had intrastate revenues in Indiana of approximately $115,000, and it transported as many as ten intrastate shipments in a one-day time frame. Furthermore, Central has provided extensive *interstate* service for Indiana shippers and receivers as far south as Little Rock, Arkansas; as far east as Syracuse, New York; as far north as St. Paul, Minnesota and Toronto, Ontario; and as far west as St. Louis, Missouri.

On February 21, 1983, Central filed an application with the PSC for a certificate of public convenience and necessity. The application sought authority to operate motor vehicles as an intrastate common carrier of general commodities (except commodities in bulk, tank vehicles) among all points in Indiana. A hearing on the application was held before an administrative law judge on July 27, October 11–13, and November 9, 1983. A number of competing motor carriers—Associated Truck Lines, Holland Motor Express, North Express, Overland Express, Renner's Express, and Turner Trucking Company (the Objectors and appellants herein)—protested and presented evidence in opposition to the application.

Central's application was supported by the testimony of representatives of several companies, including General Electric, Ford Electronics, Ford Motor Company—Bedford Division (Ford-Bedford), Ford Motor Company—Indianapolis Division (Ford-Indianapolis), Reeves Brothers, Cooper Industrial, Sheller Globe, Hamilton Glass, Hoover Universal, Ball Plastics, J.I. Case, Brunner Engineering, and Circle-Prosco (collectively, the Supporting Shippers). In addition to providing testimony, the representatives submitted written, prepared statements which, during the course of their testimony, were admitted into evidence. This evidence reveals the following facts.

All of the Supporting Shippers have employed Central for *interstate* shipments, and each seeks to consolidate that interstate service with its intrastate service re-

quirements.[2] The reasons for seeking consolidation of Central's interstate and intrastate services include more efficiency by reducing time spent on loading and unloading and on transportation paperwork. Consolidation also makes tracing shipments easier and relieves dock congestion by reducing the number of carriers coming in and out of the shipper's business. Finally, consolidation allows a shipper to reduce the number of carriers utilized, permitting it to tender more freight to one carrier and thus to increase its bargaining position with respect to rate negotiations and service expectations.

Some of the Supporting Shippers, such as Hoover, J.I. Case, and Circle-Prosco, have employed Central for some of their intrastate shipments. Many of them, however, are not currently using Central's intrastate services, mostly because Central cannot serve intrastate needs or has been unable to offer a competitive intrastate rate under its limited intrastate authority. Nevertheless, the Supporting Shippers chose Central as the carrier to provide them with coordinated interstate and intrastate service because its past services have surpassed the services of other carriers. For example, Central is familiar with the automotive industry which, due to reduced inventories and daily schedule changes, requires flexible overnight and last minute service and necessitates using Central's early morning deliveries, next day service, and excellent transit times. Moreover, Central's tracing system for locating shipments is superior and innovative. In contrast to the service of Central, the Supporting Shippers have not been satisfied with the service of the other common carriers on both an intrastate and interstate basis.[3]

2. The Supporting Shippers have diverse intrastate geographical transportation needs with representative origin and destination points for intrastate service as follows: General Electric needs service from Evansville and Mount Vernon to at least fifty shipping points, including Muncie, Lafayette, Argos, South Bend, Albion, Fort Wayne, Kokomo, Austin, and Columbus; Ford Electronics needs service from Connersville to Indianapolis and to Connersville from Carmel, Clarksville, LaPorte, Muncie, Columbia City, Columbus, Fort Wayne, Hammond, Indianapolis, Richmond, Roanoke, Rochester, and Salem; Ford-Bedford needs service to Bedford from LaPorte, Richmond, Fort Wayne, Peru, Indianapolis, Noblesville, Butler, Logansport, Greensburg, South Bend, Mishawaka, and Medora; Ford-Indianapolis needs service to Indianapolis from South Bend and Logansport; Reeves needs service from Auburn to Columbia City, Fort Wayne, New Albany, Decatur, and Indianapolis; Cooper needs service primarily to Auburn from South Bend, Logansport, Parker City, Muncie, and Howe; Sheller requires service mainly to Grabill from Fort Wayne, Union City, Columbia City, Lafayette, and South Bend; Hamilton needs service to Vincennes from Warsaw, Elkhart, Fort Wayne, Indianapolis, Evansville, and Terre Haute and also has a need for service from Vincennes to Fort Wayne, Elkhart, Madison, Terre Haute, Lebanon, Indianapolis, Jasper, Bloomington, and Evansville; Hoover, for its Vincennes facility, needs outbound service to Indianapolis and inbound service from Evansville, Madison, Terre Haute, and Indianapolis; Ball needs service from Evansville to Muncie and Indianapolis; J.I. Case needs service to Terre Haute from Connersville, Gary, Muncie, South Bend, Kokomo, Lafayette, Indianapolis, and Fort Wayne, and from Terre Haute to Princeton, Muncie, Veedersburg, South Bend, Schereville, Columbus, Evansville, and LaPorte; Brunner needs service from Bedford to Middlebury, Goshen, Elkhart, Carmel, Madison, Huntington, and Indianapolis; Circle-Prosco needs service for shipments to Bloomington from Gary, Hammond, and Indianapolis and, at the same time, seeks outbound service from Bloomington to Anderson, Columbus, Connersville, Franklin, Indianapolis, and Peru.

3. For example, General Electric has been dissatisfied with lengthy transit times. Ford-Bedord has not been satisfied with the current service of intrastate carriers, and Ford-Indianapolis has had problems with unsatisfactory delivery times. Some carriers are unable to serve all of Reeves's interstate points, and Reeves has concluded that other carriers do not have the ability to provide a quality consolidated service. Sheller has encountered carriers with slow transit times, late, instead of early, morning delivery, an inability to work out weekend shipment problems, and a lack of real interest in its business. Hamilton has experienced slow service and damaged freight. The common carriers Hoover is currently using have not operated on a timely basis. A carrier Ball has used does not serve all of Ball's needed interstate points, and Ball has experienced untimely service and damaged freight from other carriers. J.I. Case has found that other carriers do not offer the extensive less-than-truckload service in the midwest that J.I. Case needs in order to consolidate its interstate and intrastate freight. Brunner has experienced untimely service from one carrier and discontinued using that carrier even though it offered a discount.

Central's application was also supported by the testimony of its representative, James D. Payne. His testimony revealed Central proposes to coordinate its Indiana intrastate and interstate service throughout its area of operations in the event the application is granted. It proposes to offer a 20% across-the-board discount and to supplement this competitive rate with point-to-point discount programs similar to those presently provided for interstate shipments and a 5% discount guarantee for next day service. Central substantiated these proposed rate discounts through similar interstate and intrastate average transit times, its unique terminal set up, and its efficient reference number system for tracing shipments and billing.

After the hearing, the administrative law judge submitted his recommended order on January 25, 1984 that Central's application be denied. Central filed its exceptions to the recommended order with the PSC, and the PSC granted the authority sought by Central.

The Objectors appeal the PSC's decision, alleging the following errors in the application procedure and the PSC decision:

(1) The decision by the PSC was arbitrary and capricious due to procedural irregularities in handling the application, including:

(a) the administrative law judge who presided over the hearing concluded the application should be denied, and a different administrative law judge wrote the PSC's final order granting the application;

(b) the PSC's decision adopted part of an order proposed by Central in its brief in support of exceptions;

(c) the PSC's original order did not address all of the issues raised by Objectors in their briefs;

(d) the administrative law judge made a docket entry denying the petition for rehearing without addressing any of the issues;

(e) the PSC has granted virtually all common carrier applications in recent years, adopting a new philosophy without any legislative deregulation;

(2) The PSC erred in relying on concomitant interstate and intrastate service and rate discounts as factors because they are nonstatutory criteria and not supported by the evidence;

(3) The PSC's decision was arbitrary and capricious because it adopted different standards than those earlier used in a similar case.

*Procedural Issues*

■ The Objectors initially assert the granting of the application was improper because the PSC reversed the recommended order of the administrative law judge without hearing any additional evidence. Without citation to any statutory or case law authority or offering any rationale, the Objectors conclude this is proof the order by the PSC granting Central's application was arbitrary and capricious.

The powers and duties of the PSC with respect to the regulation of motor carriers are statutorily defined at IND.CODE 8-2-7-6. This section provides, in pertinent part:

"(a) The commission is hereby vested with power and authority to supervise and regulate every motor carrier subject to the provisions of this chapter....

(d) The commission shall have the power to hear all petitions, applications or motions filed with the commission. Such hearings may be conducted by the commission, by any member of the commission or by any administrative law judge authorized by the commission.... Such orders recommended by such administrative law judge shall be held for not less than ten (10) days during which time interested parties may file written exceptions thereto. In case no exceptions are filed, the finding of facts and decision in form of order suggested by such administrative law judge shall be the order of the commission, unless the commission, in its discretion, directs otherwise."

In *Odle v. Public Service Commission* (1973), 156 Ind.App. 538, 297 N.E.2d 453,

our court addressed a challenge essentially the same as the Objectors' claim in this case—that the PSC is bound by and may not reverse the recommended order of an administrative law judge unless the PSC takes further action by hearing additional evidence or actually reviewing the entire record of the application in question. In interpreting the statutory power granted to the PSC, the court held:

> "There are no murkey depths to this statute. It is clear from top to bottom that *the Commission* is vested with the power to regulate motor carriers. *The Commission* or 'any authorized representative of the Commission' acting in effect as its agent has the power to hear witnesses, take testimony under oath and make a record thereof. *The Commission* has the power to 'hear all petitions, applications or motions filed with the Commission.' While a hearing may be conducted by a member of the Commission or by an [administrative law judge] *authorized* by the Commission, if the hearing is conducted by an [administrative law judge] a report must be made to the Commission as to the findings of fact and the suggested Order which after a period of time becomes final 'unless *the Commission* in its discretion directs otherwise.'
>
> \* \* \* \* \* \*
>
> The plain unambiguous terms of the statute vest the ultimate fact-finding and decision-making authority in *the Commission.* To interpret it as lodging in a non-member [administrative law judge] finality as to his decision independent of the Commission is contrary to the express statutory scheme for the supervision and regulation of motor carriers."

*Id.* at 545–46, 297 N.E.2d at 458 (emphasis in original). Such a definitive statement leaves no doubt as to the resolution of the issue, and we do not choose to deviate from

this sound statutory interpretation. Thus, the PSC is not bound by the recommended order of an administrative law judge in such situations.[4]

■ The second of the Objectors' allegations of procedural irregularities is that the PSC adopted part of an order proposed by Central in its brief in support of exception. In their reply brief, the Objectors admit the PSC can adopt the proposed findings submitted by a party, but assert this is limited to situations where it has heard the evidence. Again, without citation to any authority, the Objectors argue adoption of a party's findings without hearing the evidence demonstrates the decision by the PSC was predetermined and thus is arbitrary and capricious.

As we have observed earlier, however, the statute provides that the findings of fact submitted by the administrative law judge "shall be the order of the commission, unless the commission, in its discretion, directs otherwise." I.C. 8–2–7–6(d). The statute does not require the PSC to rehear the evidence before it adopts findings different from those submitted by the administrative law judge. No authority for this requirement is cited, nor can we find any. Thus, we decline to impose such an obligation when none is statutorily required. If the findings are erroneous or not supported by the evidence, the proper remedy would be to challenge on appeal the sufficiency of the evidence allegedly supporting the findings.

■ Next, the Objectors claim the PSC's original order in this case did not address all of the issues raised by the Objectors in their briefs. They also allege the administrative law judge improperly denied rehearing by a docket entry. Central contends, and we agree, that these errors are harmless because the PSC, in its order on petition for rehearing, reviewed and rejected

---

**4.** In their reply brief, the Objectors attempt to limit the holding in *Odle* to situations where the administrative law judge who heard the evidence dies or is otherwise incapacitated between the time of the close of the hearing and the preparation of the proposed order. No such limitation is present in the *Odle* decision, and the Objectors cite no authority for this proposition. Thus, we decline the invitation to restrict the authority of the PSC by altering the holding in *Odle.*

the arguments raised by the Objectors before affirming its original decision.

It is axiomatic that in an appeal, the appellant must demonstrate that a ruling was erroneous and prejudice resulted. *P.S. by Harbin v. W.S.* (1983), Ind., 452 N.E.2d 969. In the case at hand, the Objectors fail to demonstrate either the procedural handling of the case was erroneous or any irregularities resulted in prejudice to them. To begin with, Indiana Rules of Procedure, Appellate Rule 8.3(A)(7) provides that the argument section of an appellant's brief "shall contain ... the reasons in support of the contentions along with citations to the authorities, statutes, and parts of the record relied on, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review." The Objectors' brief is devoid of any authority showing the procedure was improper or any rationale as to how they were prejudiced. Moreover, the PSC issued a lengthy opinion in its denial of the rehearing which addressed all of the Objectors' issues. Thus, any failure by the PSC to address in its original order all issues raised by the Objectors in their briefs and any improper denial of rehearing by docket entry were harmless errors, if errors at all, because all of the Objectors' issues were ultimately considered and rejected by the PSC.

Finally, the Objectors allege the decision by the PSC was arbitrary and capricious because the PSC adopted a "new philosophy" that is lenient toward granting motor carrier applications and the PSC should wait until pending legislation deregulates the motor carrier industry before acting on this "new philosophy." To support their argument, the Objectors state, "Since the expansion of the Commission from three to five members on January 1, 1984, only one out of hundreds of permanent applications for extensions of operating authority have [sic] been denied." Appellants' brief, p. 15.

When error is alleged but is not disclosed by the record, it is not a proper subject for review by our court. *Cook v. Hahn* (1980), Ind.App., 403 N.E.2d 834. The statistical analysis of the number of applications granted and denied by the PSC over the past two years is not a part of the record in this case, and we cannot take judicial notice of the proceedings in numerous other PSC decisions as suggested by the Objectors. Judicial notice is usually limited to facts generally known with certainty by people in the community or facts readily and indisputably confirmed as to their accuracy. *Weinstock v. Ott* (1983), Ind.App., 444 N.E.2d 1227. Moreover, a court normally may not even take judicial notice of its own records in a prior, separate case. *See, e.g., Freson v. Combs* (1982), Ind.App., 433 N.E.2d 55. Thus, we decline the Objectors' invitation to take judicial notice of prior PSC decisions, and this argument is not a proper one for review by our court.

*Public Convenience and Necessity*

The Objectors also allege the PSC used improper criteria to determine whether Central's application should be granted. Specifically, they suggest the PSC erroneously relied on concomitant interstate and intrastate service and rate discounts because they are nonstatutory criteria. Likewise, they challenge the sufficiency of the evidence in the record to support these findings.

Initially, we recognize there are several levels of review when a decision by the PSC is challenged. First, the PSC's determination must contain specific findings of fact on all determinations material to its order.[5] Second, substantial evidence in the record must support the findings of fact. Third, the findings of fact must reasonably support the PSC's ultimate conclusion. *Habig Trucking & Excavating, Inc. v. Public Service Commission* (1984), Ind. App., 466 N.E.2d 484; *Coastal Tank Lines,*

---

**5.** The Objectors raise no issue over the specificity of the findings. Thus, our decision need not address this level of review.

*Inc. v. Propane Transport, Inc.* (1981), Ind.App., 416 N.E.2d 440.

In all application proceedings for common carrier authority, applicants such as Central have the burden of proving, by a preponderance of the evidence, "that public convenience and necessity requires the proposed operation, and that the proposed operation will not unreasonably impair the existing public service of any authorized common carrier ... then adequately serving the same territory." IND.CODE 8–2–7–15(b). The statute also provides a partial list of factors "the commission may, among other things, consider...." *Id.* (d). This list includes:

"1. The financial ability of the applicant to furnish adequate service.

2. Whether existing transportation service is adequate.

3. The effect upon existing transportation, and, particularly, whether the granting of such application will or may seriously impair such existing service.

4. The volume of existing traffic over the route proposed by the applicant.

5. The effect and burden upon the highways and the bridges thereon, and the use thereof by the public.

6. Whether the operations will threaten the safety of the public or be detrimental to the public welfare."

*Id.* Our court, however, has specifically refused to formulate minimum standards of proof upon which a finding of public convenience and necessity must be based. *Jack Gray Transport, Inc. v. Public Service Commission* (1978), 177 Ind.App. 576, 380 N.E.2d 1250; *V.I.P. Limousine Service, Inc. v. Herider-Sindus, Inc.* (1976), 171 Ind.App. 109, 355 N.E.2d 441.

■ The Objectors claim the PSC's finding regarding Central's concomitant interstate and intrastate service does not support its conclusion to grant Central's application due to public convenience and necessity. In *Coastal Tank Lines, supra,* 416 N.E.2d at 443–44, however, our court stated, "Although evidence of interstate operations alone may not be sufficient to establish public convenience and necessity, it is

certainly a factor upon which the PSC, in its discretion, may receive evidence." Thus, the Objectors' argument that Central's interstate service was not a proper issue for the PSC to consider is without merit.

■ The Objectors also challenge the sufficiency of the evidence to support the PSC's finding that the Supporting Shippers would be benefitted by concomitant interstate and intrastate service provided by Central. They state there was no evidence the Supporting Shippers needed the concomitant service, the Objectors could supply any needed service, the Supporting Shippers were not using services currently provided by Central, and Central is currently able to meet the supporting Shippers' needs.

Our standard of review to determine whether the findings are supported by the record is:

"In reviewing the sufficiency of the evidence to sustain an administrative agency's grant of authority, this Court will not weigh the evidence nor substitute its judgment for that of the PSC. The function of an appellate court is to examine the record to determine if there is substantial evidence upon which the PSC could have made its decision."

*Coastal Tank Lines, supra,* 416 N.E.2d at 444 (citation omitted). In applying the above stated standard to the findings challenged by the Objectors, we conclude the challenges are without merit.

Substantial evidence appears in the record of the benefits afforded by a consolidation of intrastate and interstate service. According to the testimony of the Supporting Shippers, consolidation allows them, as shippers, more efficiency by reducing time spent on loading and unloading and by reducing time spent on transportation paperwork. Consolidation also makes it easier for shippers to trace shipments and relieves dock congestion by reducing the number of carriers coming in and out of the shippers' businesses. Allowing shippers to reduce the number of carriers uti-

lized also permits shippers to tender more freight to one carrier and thus improves their bargaining position with respect to rate negotiations and service expectations. In fact, the Objectors admit in their brief, "Without exception, all of the supporting shipper witnesses voiced a need for the concommitant [sic] interstate and intrastate service of a single carrier...." Appellants' brief, p. 37.

The Objectors further argue the evidence shows they could supply any needed service to the Supporting Shippers. Although the Objectors did make such a claim at the hearing, they fail to disclose the relevant evidence in the record to support such a claim. In contrast, the PSC observed that many of the Objectors possessed ICC authority, but did not provide extensive interstate services, including needed service to Canada. Moreover, the PSC noted the Objectors failed to support their claim with any evidence such as a system wide traffic study. Neither our court nor the PSC is obligated to accept such unsupported allegations of service.

Furthermore, the PSC was faced with evidence from the Supporting Shippers as to why they chose Central as the carrier to provide them with a coordinated interstate and intrastate service. First, Central's past services have been excellent and have surpassed the services of other carriers. In particular, Central is familiar with the automotive industry which, due to reduced inventories and daily schedule changes, requires flexible overnight and last minute service. Thus, many of the Supporting Shippers who deal with the automotive industry are in need of Central's early morning deliveries, next-day service, and excellent transit times. In addition, Central's tracing system for locating shipments is superior and innovative.

In contrast to the service of Central, the Supporting Shippers have not been satisfied with the service of other common carriers on both an intrastate and interstate basis. General Electric, Sheller, and Hamilton have experienced lengthy and slow transit times. Hamilton and Ball have had problems with damaged freight. Hoover, Brunner, and Ball expressed dissatisfaction with untimely service. Unsatisfactory delivery times have plagued Ford-Indianapolis and Sheller. Reeves and Ball complained the current carriers are unable to serve all of their required delivery points. Many of the problems identified by the Supporting Shippers involved the services of one or more of the Objectors.

Here, the PSC was presented with evidence as to the benefits of a coordinated interstate and intrastate service. It was also faced with evidence from the Supporting Shippers as to why Central, and not the Objectors, was the carrier they needed to provide that service. In asserting that they too can provide a coordinated service, the Objectors are asking us to reweigh the evidence and to judge the credibility of their evidence as contrasted with the evidence of the Supporting Shippers. But we cannot substitute our judgment for that of the PSC simply because such issues regarding weight and credibility are for the PSC, not this court, to decide. *Coastal Tank Lines, supra.*

■ As the third basis for attacking the need for a coordinated service, the Objectors argue that little or no weight should be placed upon the testimony of the Supporting Shippers because, supposedly, the Supporting Shippers are not even using the intrastate service Central can currently provide. Such a statement is contrary to the evidence in this case. First, Central's evidence demonstrated it had been providing an intrastate service within the state of Indiana, with intrastate revenues of approximately $115,000 in 1982. As a representative sample, Central transported eight to ten intrastate shipments in a one-day time frame. Additionally, three of the Supporting Shippers, Hoover, J.I. Case, and Circle-Prosco, testified they had employed Central for some of their intrastate shipments. Finally, the Supporting Shippers who were not currently using Central's limited intrastate service testified that Central's limited intrastate authority prohibited it from serving all of their intrastate needs

and that Central had been unable to offer a competitive intrastate rate.

The Objectors also claim Central is currently able to serve all of the needs of the Supporting Shippers. The record, however, reveals otherwise. For example, the Objectors assert the "great majority" of General Electric's traffic moves to Indianapolis and, under its existing authority, Central can serve those needs. General Electric's witness testified, however, that shipments to Indianapolis constitute only about 40% of its traffic. Moreover, General Electric's witness testified that the company needs service from Evansville and Mount Vernon to at least fifty shipping points, including points such as Argos, South Bend, Fort Wayne, and Columbus—points that Central is not authorized to serve. The Objectors further assert Central can currently serve the inbound traffic needs of "Ford Motor Company", but ignore that Ford Electronics needs services to Connersville from such places as LaPorte, Columbus, Fort Wayne, and Hammond, and that Ford-Bedford needs services to Bedford from La-Porte, Fort Wayne, and South Bend. Such services cannot currently be performed by Central.

Other examples include the Objectors' argument that J.I. Case can use Central for some shipments, even though the Objectors disregard the fact that Central cannot provide needed service to Terre Haute from such places as Connersville, Gary, and South Bend. They state Hoover can currently be served by Central on its outbound service from Vincennes to Indianapolis, but ignore that Hoover also needs inbound service from Evansville and Terre Haute to Vincennes. Central cannot provide such service. The Objectors inaccurately describe Central's authority in stating that Central can currently provide services from Howe to Auburn on behalf of Cooper. As disclosed by Central's map, Howe, located in the far northern part of the state, is not on Central's regular route authority and, because a movement from Howe to Auburn would not have either an origin or a destination within a 50-mile radius of Kokomo, Central cannot provide such a service.

Therefore, we conclude the PSC was presented with sufficient evidence that many of the transportation needs of the Supporting Shippers cannot currently be provided by Central. There was sufficient evidence for the PSC to conclude that an extension of Central's authority would allow it to serve the Supporting Shippers' intrastate needs and to coordinate those needs with interstate traffic currently being provided by Central. In turn, this was a proper factor to determine whether the public convenience and necessity would require the proposed operations.

 The second factor the Objectors challenge as an improper consideration for public convenience and necessity is one of proposed rates and increased competition. Both the Objectors and Central agree there is no Indiana case law on point and in such situations, our courts and the PSC have looked to federal cases that interpret decisions of the ICC as persuasive authority. *Graves Trucking, Inc. v. B.G. Trucking, Inc.* (1972), 151 Ind.App. 563, 280 N.E.2d 834. The Objectors argue the PSC erroneously interpreted federal law as permitting consideration of proposed discounts such as those offered by Central as a factor in making the public convenience and necessity finding.

To support their argument, the Objectors cite four older ICC cases. In *J.J. & E.D. Wellspeak—Common Carrier Application* (1937), 1 M.C.C. 712, 715, the ICC stated, "The only convincing evidence as to the reason for applicant's ability to obtain this traffic is the fact that they published and applied lower rates." The ICC repeated this admonition in *Southland Produce Co., Contract Carrier Application* (1959), 81 M.C.C. 625, 628, when it stated, "The level of rates is not a factor which we may consider in determining whether a proposed service is in the public interest, unless it is demonstrating the existing rates are so unreasonably high as to constitute, in effect, an embargo." *See also H. David Pitzer—Contract Carrier Application* (1961), 86 M.C.C. 714; *Newmarket Coach*

*Lines, Limited Common Carrier Application* (1960), 84 M.C.C. 264.

The PSC, however, relied upon later decisions in making a determination of public convenience and necessity. In *Bowman Transportation v. Arkansas—Best Freight System* (1974), 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447, the Supreme Court approved the ICC's more congenial approach to new entry into the motor carrier market and resulting competition. The Court determined such an approach was within the ICC's prerogative in carrying out its mandate to insure safe, adequate, economical, and efficient service.[6] As the PSC observed in this case, IC 8–2–7–5 also requires the PSC to promote safe, adequate, economical, and efficient service. We find the rationale of the *Arkansas-Best Freight* decision is equally applicable when interpreting the Indiana statutes under which the PSC derives its authority.

After the *Arkansas-Best Freight* decision, and before the enactment of the Motor Carrier Act of 1980, both the ICC and federal courts emphasized that increased competition could be a factor in finding public convenience and necessity. *See, e.g., P.C. Truck Line, Inc. v. Interstate Commerce Commission* (D.C.Cir.1977), 551 F.2d 1326; *Liberty Trucking Co.—General Commodities* (1978), 130 M.C.C. 243. In response, the ICC adopted a policy in Ex Parte No. MC–116, 44 Fed.Reg. 10,064 (1979), which stated:

"This general policy statement governs the consideration of rates in motor common carrier operating rights application proceedings. Parties will have the option of placing rate levels in issue in operating right proceedings. The ability of an applicant to offer the shipping public lower rates based on operating efficiencies is a factor that will be considered in determining whether there is a need for additional service."

Finally, Congress enacted the Motor Carrier Act of 1980, mandating the ICC to allow a variety of quality and price options, and "substituting competition for regulation as the mechanism for ensuring efficient and adequate service." *RTC Transportation, Inc. v. Interstate Commerce Commission* (11th Cir.1984), 731 F.2d 1497, 1499.

Although Indiana case law has neither specifically defined public convenience and necessity nor held that evidence pertaining to rates and competition is admissible, we must recognize that federal law supports the approach taken by the PSC in this case. The ICC cases cited by the Objectors which criticize the use of rates and competition were all decided before the *Arkansas-Best Freight* case and its progeny and a close reading of the cited cases reveals the ICC was most concerned that rates not be the sole or primary factor relief upon in an application proceeding. Here, the PSC based its decision upon a variety of factors, including the Supporting Shippers need for competitive rates. We have no problem in concluding the use of this factor by the PSC was not improper.

■ The Objectors likewise challenge the sufficiency of the evidence to support the rate and competition finding. Without reweighing the evidence or substituting our judgment for that of the PSC, we note the PSC heard the Supporting Shippers' request for more competitive rates on an intrastate basis. According to the Supporting Shippers, competitive rate pricing and negotiations are needed due to ICC deregu-

---

**6.** National Transportation Act, ch. 722, 54 Stat. 899 (1940) (codified preceding 49 U.S.C. Sec. 1 (1976). With the passage of the Motor Carrier Act of 1980, 49 U.S.C. Sec. 10101–10114 (1980), Congress specifically stated one goal of the ICC is to allow a variety of quality and price options. 49 U.S.C. Sec. 10101(a)(2)(B). Thus, there is no doubt the evidence of rates is presently admissible in a federal application proceeding. The *Arkansas-Best Freight* case, however, was decided before the enactment of the Motor Carrier Act of 1980. In that case, the Supreme Court was compelled to interpret 49 U.S.C. Sec. 307, a statute that permitted the ICC to grant authority if the proposed service was or would be "required by the present or future public convenience and necessity." Thus, the language interpreted by the Supreme Court was almost identical to Indiana's statutory directive of public convenience and necessity. *See* I.C. 8–2–7–15(b).

lations, which has made interstate transportation pricing more complicated, competitive, and emphasized. It also has increased foreign and intrastate transportation costs.

Again, the Objectors ask us to rejudge the credibility of the witnesses and to determine that Central's proposal of lowering its rates should not be given due weight because Central has not provided such discounts in the past. The PSC, however, properly considered the testimony of Central's witness that its limited intrastate authority has made such a discount infeasible. Furthermore, as the PSC observed, Central's evidence showed that implementation of its Indianapolis terminal as a "break bulk" or "hub" facility has made the timing appropriate to offer state wide across-the-board discounts to the Indiana shipping public. As noted earlier, we may not reweigh the credibility of Central's witness. *Coastal Tank Lines, supra.* Similarly, we cannot reevaluate the Objectors' argument that they too offer discounts. As the PSC observed, only one Objector offers an across-the-board discount. Moreover, although individual common carriers may offer lower rates under certain circumstances, such evidence must be judged in light of the testimony of the Supporting Shippers that they had received unsatisfactory service from many of the Objectors. For example, because Brunner had received untimely service from one carrier, it ceased employing the carrier, even though the carrier offered a discount. We conclude the finding in question was supported by sufficient evidence in the record concerning rates and competition.

*Different Standards from Previous Case*

Finally, the Objectors argue the PSC's decision was arbitrary and capricious because it adopted different standards than those earlier used in a similar case. The Objectors place heavy reliance upon a prior decision of the PSC in *Preston Trucking Co., Inc.*, PSCI No. 14233–A, 2. Although they concede that the doctrine of stare decisis is not applicable to decisions of administrative agencies, the Objectors con-

tend the PSC arbitrarily and capriciously allowed Central to do that which it specifically refused Preston. The Objectors' reference to a separate case with different facts is simply unpersuasive, however, because the evidentiary criteria upon which public convenience and necessity are based in any given case are "left in large measure to the informed discretion of the Commission." *V.I.P. Limousine, supra,* 177 Ind.App. at 115, 355 N.E.2d at 445. Contrary to the arguments of the Objectors, it makes no difference that the same administrative law judge heard the evidence in both cases. What does make a difference is the evidence that was presented by Central and its Supporting Shippers. As the court stated in *V.I.P. Limousine,* "[T]he public's needs and demands are gauged by many variables, [and] specific evidentiary factors necessary to establish 'public convenience and necessity' may not, therefore, be categorized or fixed." *Id.*

The evidence presented in the *Preston* proceeding is not before us. Nevertheless, the PSC, in its order on rehearing, properly distinguished the facts of the *Preston* proceeding from the facts here, as follows:

"In particular, Preston did not conclusively establish its ability to provide a coordinated interstate and intrastate service. For example, applicant submitted more informative traffic studies; established that it operated in a much broader territory than Preston; submitted a system-wide transit time study demonstrating its responsive interstate service; submitted a transit time study involving Michigan intrastate movements used to show its service capabilities for Indiana; and submitted an empty trailer movement study used to show that its lack of state-wide intrastate authority was resulting in inefficient operations. Furthermore, the instant case has put in issue, to a much greater extent, social and economic factors. Such differences between the Preston case and this proceeding are more than sufficient to support the different results reached."

Record, p. A–117.

Central did, in fact, submit evidence of its extensive interstate services for Indiana

shippers, a system-wide traffic study showing its transit times through Indiana terminals, and a transit time study for the state of Michigan to show that, in a state comparable to the state of Indiana, it could provide a responsive and quick intrastate service. Central also showed, through its empty trailer study, that its Indiana equipment was being used inefficiently. Furthermore, the PSC, having before it different witnesses in the different cases before it, was able to judge the credibility of those witnesses as it saw fit.

Given the overwhelming support for Central's proposed operations, both on an interstate and intrastate shipment basis, the PSC was more than entitled to believe that Central's application, unlike Preston's application, was supported by public convenience and necessity. The Objectors have singled out isolated pieces of evidence from the two cases in a transparent attempt to limit the PSC's discretion and to impose upon the PSC inflexible standards for a finding of public convenience and necessity. This court rejected such an approach in

*V.I.P. Limousine, supra,* and the Objectors have presented no basis for changing the holding of that case.

In conclusion, the PSC's decision in this case was soundly based upon the law and the evidence. As shown, the PSC considered a variety of factors, sorted through the evidence, weighed it, and judged the credibility of witnesses, all within the flexible framework of the concept of public convenience and necessity. Thus, we have been presented with no valid reason to reverse the PSC's conclusion.

Judgment affirmed.

YOUNG, P.J., and CONOVER, J., concur.